**04 11726 WGY**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE RELAFEN ANTITRUST LITIGATION | Master File No. 01-CV-12239-WGY |
| STATE OF MARYLAND<br>by Attorney General J. Joseph Curran, Jr.<br>Office of the Attorney General<br>Antitrust Division<br>200 St. Paul Street<br>Baltimore, MD 21202<br><br>STATE OF ARKANSAS<br>by Attorney General Mike Beebe<br>Office of the Attorney General<br>Antitrust Division<br>323 Center St. Ste. 200<br>Little Rock, AR 72201<br><br>STATE OF IDAHO<br>by Attorney General Lawrence Wasden<br>Office of the Attorney General<br>Len B. Jordan Building<br>650 W. State St., Lower Level<br>Boise, ID 83720-0010<br><br>STATE OF ILLINOIS<br>By Attorney General Lisa Madigan<br>Office of the Attorney General<br>100 West Randolph Street, 13th Floor<br>Chicago, Illinois 60601<br><br>STATE OF OREGON<br>By Attorney General Hardy Myers<br>Oregon Department of Justice<br>1162 Court Street NE<br>Salem, Oregon 97301 | MAGISTRATE JUDGE _____<br><br>RECEIPT # _____<br>AMOUNT $ _____<br>SUMMONS ISSUED _____<br>LOCAL RULE 4.1 _____<br>WAIVER FORM _____<br>MCF ISSUED _____<br>BY DPTY. CLK. _____<br>DATE _____ |

PLAINTIFF STATES' COMPLAINT                                                      PAGE    1

|  |  |
|---|---|
| and )<br>)<br>)<br>STATE OF WASHINGTON )<br>by Attorney General Christine O. Gregoire )<br>Office of the Attorney General )<br>900 Fourth Avenue, Suite 2000 )<br>Seattle, Washington 98164, )<br>)<br>    Plaintiffs )<br>)<br>  v. )<br>)<br>SmithKline Beecham Corporation )<br>One Franklin Plaza )<br>16th and Race Streets )<br>Philadelphia, PA 19102, )<br>)<br>  And )<br>)<br>SmithKline Beecham plc, )<br>One Franklin Plaza )<br>16th and Race Streets )<br>Philadelphia, PA 19102, )<br>)<br>    Defendants. ) | **04 11726 WGY** |

## COMPLAINT

The States of Arkansas, Idaho, Illinois, Maryland, Oregon and Washington (collectively "Plaintiff States" or "States"), by and through their Attorneys General, for their Complaint against Defendant SmithKline Beecham Corporation and SmithKline Beecham plc ("GSK" or "Defendants") to secure damages, injunctive and other equitable relief for Defendants' violations of federal and state antitrust laws, consumer protection, and unfair and deceptive trade practices acts, allege as follows:

### I. INTRODUCTION

1. Relafen® is a brand-name prescription drug containing nabumetone as its active pharmaceutical ingredient. Relafen® is a non-steroidal anti-inflammatory drug ("NSAID"), used

to treat diseases characterized by inflammation, and a chemical compound disclosed by U.S. Patent No. 4,420,639 (the "'639 Patent"). Prior to August 2001, no other brand-name or generic nabumetone-based drug was marketed in the United States, due to the Defendants' anticompetitive conduct including unlawfully obtaining and enforcing a monopoly for Relafen® and nabumetone-based drugs through intentional misrepresentation to the U.S. Patent and Trade Mark Office ("PTO"). In 2002, GSK's sales of Relafen® in the United States were over $200 million.

2. Defendants obtained a patent for nabumetone and had it listed in the Food and Drug Administration's (FDA) *Orange Book*, defined below, which enabled Defendants to falsely create and extend their monopoly for Relafen® and nabumetone. Defendants further engaged in sham litigation to unlawfully enforce their patent, even though they knew that the patent was invalid. As a result, consumers were forced to pay more for nabumetone.

3. Plaintiff States seek the following: a) a finding that Defendants' actions violated federal and state antitrust laws, consumer protection laws, unfair competition laws and other related state laws; b) a permanent injunction preventing Defendants from submitting the '639 Patent for listing in the *Orange Book* and from taking other actions similar to those which resulted in the improper delay in generic competition for nabumetone; and c) relief for injuries sustained as a result of Defendants' violations of law.

## II. PARTIES

4. Defendant SmithKline Beecham Corporation is a corporation organized and existing under the laws of the commonwealth of Pennsylvania, doing business as GlaxoSmithKline ("SmithKline"). Its principal place of business is at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania 19102. SmithKline develops, manufactures, markets, sells, and distributes pharmaceutical products, including Relafen®.

5.      Defendant SmithKline Beecham plc is a corporation organized and existing under the laws of the United Kingdom, and is a corporate affiliate of SmithKline Beecham Corporation ("Beecham"). Its principal place of business within the United States is at One Franklin Plaza, 16th and Race Streets, Philadelphia, Pennsylvania 19102. Both SmithKline Beecham Corporation and SmithKline Beecham plc are hereinafter referred to as "GSK" or "Defendants." Defendants manufacture and market Relafen® throughout the United States.

6.      Plaintiff States moved to intervene in this case on July 7, 2004, on the grounds that consumers in their states were entitled to recovery under Group I, as defined in the proposed settlement in the above captioned case, and that their Attorneys General have sole authority to recover for harm to natural person consumers. The Plaintiff States bring this action by and through their Attorneys General under statutory, equitable and/or common law authority including but not limited to: (a) federal or state law, in their sovereign capacities, as representatives of, and/or as parens patriae on behalf of, or for the benefit of, natural persons who paid for Relafen® or any other nabumetone product during the relevant time period; (b) in their proprietary capacities on behalf of represented entities which may include state departments, bureaus, agencies, political subdivisions, and other government entities as direct or indirect purchasers, and/or as assignees of the antitrust causes of action of intermediate purchasers through which they procured or reimbursed for such drugs, or as purchasers under medical or pharmaceutical reimbursement programs, of such drugs during the relevant time period (hereinafter "State Governmental Entities"); (c) as common law *parens patriae* in their sovereign capacities on behalf of their respective states' general economies; and/or (d) in their capacities as enforcers of state law to enjoin violations, to disgorge unjust profits, and to provide relief for injuries incurred in their states by securing damages and/or restitution, injunctions and other equitable remedies.

## III. JURISDICTION AND VENUE

7. Subject matter jurisdiction is proper pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4, 4C, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, 22 and 26, and under 28 U.S.C. §§ 1331, 1337.

8. In addition to pleading violations of federal antitrust law, the States also allege violations of state antitrust, consumer protection and/or unfair competition statutes and related state laws, as set forth below, and seek damages, civil penalties and/or equitable relief under those state laws. All claims under federal and state law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding. This Court has jurisdiction of the non-federal claims under 28 U.S.C. § 1367(a), and under the principles of supplemental jurisdiction. Supplemental jurisdiction will avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience, and fairness.

9. Venue is proper in this Court under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c). Defendants transact business in this district. Further, the claims alleged arose, in whole or in part, in this judicial district, and a substantial portion of the affected trade and commerce described below has been carried out in this judicial district.

## IV. STATEMENT OF FACTS

### A. Pioneer Drugs

10. Under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*, a drug manufacturer must obtain approval from the FDA before the manufacturer may lawfully begin selling a new drug (also called a "pioneer drug") in the United States. 21 U.S.C. § 355(a). In order to obtain FDA approval, the manufacturer must file a New Drug Application ("NDA")

demonstrating that the drug is safe and effective for its intended use. 21 U.S.C. § 355(b) or 355(j).

11. The NDA must contain, among other things, data on the composition of the drug product including its active ingredient, the means for its manufacture, and a statement of its proposed uses. An NDA must list all patents that claim the approved drug where a claim of patent infringement could reasonably be asserted against an unauthorized manufacturer or seller of the drug. 21 U.S.C. § 355(b) and (c)).

12. A pioneer drug is typically covered by one or more patents, which grant the owner the right to exclude others from manufacturing for sale the new drug for the duration of the patent(s) including any extensions of the original patent period granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355 ("Hatch Waxman" or "Hatch-Waxman Act").

13. Once the NDA is approved, and upon certification by the brand-name manufacturer that the newly-issued patent meets the listing criteria, the FDA publishes the patent information submitted by the manufacturer in a publication commonly referred to as the *Orange Book*. *See* 21 U.S.C. § 355(j)(7)(a)(iii) (formally titled, "Approved Drug Products with Therapeutic Equivalent Evaluations"). The FDA has a long-standing, publicly announced policy of accepting at face value the accuracy of patent information it receives from a patent holder, and its eligibility for *Orange Book* filing.

14. Once approved, a new drug may be labeled, marketed and advertised only for FDA-approved uses. A pharmacist filling a prescription must fill the prescription with the drug brand specified by the physician, unless an FDA-approved generic version is available and applicable state law provides for generic substitution.

B. **Generic Drugs**

15. A generic drug is one that has been approved by the FDA as bioequivalent to a brand-name drug in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.

16. Generic drugs are usually priced substantially below the brand-name drug. Typically, the first generic drug to be sold is priced at a percentage discount off the brand-name drug price, and even steeper price reductions occur as additional generic versions become available.

17. A brand-name drug generally loses substantial market share to generic competition within a relatively short time after a generic is introduced to the market. Consumers covered by some form of insurance or benefit plan often switch to a generic bioequivalent and may be encouraged to do so by virtue of a lower co-payment for generics. Consumers who pay cash for prescriptions also switch from brand-name to generic drugs to obtain the lower price.

18. A principal goal of Hatch Waxman was to facilitate generic competition by streamlining the process by which manufacturers of generic drugs receive regulatory approval to bring their products to market. *See Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998). Under Hatch Waxman, a company may seek expedited FDA approval to market a generic version of a brand-name drug with an approved NDA by filing an Abbreviated New Drug Application ("ANDA") pursuant to 21 U.S.C. § 355(j). An ANDA filer relies on the safety and efficacy data already filed with the FDA by the brand-name manufacturer. 21 U.S.C. § 355(j)(2)(A)(I).

19. In its ANDA, a generic manufacturer generally must certify to the FDA that one of the following conditions is satisfied: (i) no patent covering the drug has been filed with the FDA ("Paragraph I Certification"); (ii) the patent for the brand-name drug has expired

("Paragraph II Certification"); (iii) the patent for the brand-name drug will expire on a particular date, and the generic company does not seek to market its generic product before that date ("Paragraph III Certification"); or (iv) the patent for the brand-name drug is invalid or will not be infringed by the generic company's proposed product ("Paragraph IV Certification"). 21 U.S.C. § 355(j)(2)(A)(vii).

20. Pursuant to a Paragraph III or Paragraph IV Certification, the Hatch-Waxman Act allows ANDA applicants to perform all necessary testing, to submit an application for approval, and to receive tentative approval before the relevant patents covering the brand-name pioneer drug expire. Upon the patents' expiration and receipt of FDA final approval, the generic drug companies may market their generic versions of the brand-name drug.

21. If the generic manufacturer submits a Paragraph IV certification, it must notify the patent owner of the filing and explain why the patent is invalid or will not be infringed. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). If the patent holder fails to initiate an infringement suit within forty-five days of receipt of the notice, FDA approval of the ANDA proceeds without regard to patent issues. However, if a patent infringement suit is brought within the forty-five day window, the FDA is automatically barred from approving the ANDA until the earliest of thirty months after the patent holder's receipt of the Paragraph IV certification, the patent expires, or a final judicial determination of non-infringement. 21 U.S.C. § 355(j)(5)(B)(iii).

### C. Defendants' Anticompetitive Conduct

**Defendants Made Intentional Misrepresentations to the PTO and Engaged in Sham Litigation to Obtain and Maintain an Improper Monopoly for Relafen® and Nabumetone**

22. Defendants own the '639 Patent which purported to cover the chemical compound nabumetone. Pursuant to NDA No. 19-583, Defendants marketed Relafen, whose active ingredient is nabumetone, in the United States and elsewhere since February 1992. The '639

Patent resulted from filing of six U.S. patent applications, and ultimately expired on December 13, 2002.

23. Copley Pharmaceutical, Inc. ("Copley"), Teva Pharmaceuticals USA, Inc. ("Teva"), and Eon Labs Manufacturing, Inc. ("Eon") (collectively the "Generic Manufacturers") each manufacture generic pharmaceutical products. Each filed an ANDA with the FDA to market generic versions of Relafen.

24. On August 4, 1997, Copley filed ANDA No. 75-179, the first ANDA for a generic version of the Relafen® 750 mg tablet with a Paragraph IV Certification that the '639 Patent was either invalid or not infringed.

25. On August 18, 1997, Teva filed ANDA No. 75-189, the first ANDA for a generic version of the Relafen® 500 mg tablet with a Paragraph IV Certification that the '639 Patent was either invalid or not infringed. Teva acquired Copley on August 10, 1999, consolidating the ANDAs for both the 500 mg and 750 mg strengths of generic Relafen®.

26. On December 18, 1997, Eon filed ANDA 75-280 for a generic version of the Relafen® 500 mg and 750 mg tablets with a Paragraph IV Certification that the '639 Patent was either invalid or not infringed.

27. The Generic Manufacturers each gave written notice ("notice of certification") to Beecham, pursuant to 21 U.S.C. § 355(j)(2)(B)(i) and (ii), that their ANDAs and the accompanying certification had been filed with the FDA.

28. Defendants sued for infringement of the '639 Patent within forty-five days of the notices of certification (hereinafter referred to collectively as the "Infringement Actions"). Upon filing of the first suit, a 30-month stay of the FDA's authority to grant final marketing approval to the Generic Manufacturers was granted. Final approval could not be given to Teva's and

Copley's ANDAs until either they prevailed in the Infringement Actions, or the 30-month stay expired.

29. The Infringement Actions were consolidated for all purposes and captioned as *In re '639 Patent Litigation*, Civil Action No.97-12416-RCL (D. Mass.) and were assigned to the Honorable Reginald C. Lindsay.

30. The Generic Manufacturers claimed that the '639 Patent was invalid because nabumetone was anticipated by prior art, namely a 1973 article by scientists J.N. Chatterjea and R. Prasad entitled "Condensation of Mannich Base Salts with Phenols: Orientation of Adducts," published in the *Indian Journal of Chemistry*, Volume 11 at 214-18 (March 1973) (the "Chatterjea & Prasad publication"). The Generic Manufacturers argued that the Chatterjea & Prasad publication identified and enabled nabumetone and therefore anticipated all claims set forth in the '639 Patent, either explicitly or inherently. They also claimed that the '639 Patent was unenforceable because Beecham breached its duty of candor to, and engaged in inequitable conduct before, the PTO. *In re '639 Patent Litigation*, 154 F.Supp. 2d 157, 160 (D.Mass. 2001).

31. At all relevant times, Defendants knew that the '639 Patent was not their intellectual development, was anticipated by prior art, and that the '639 Patent was not enforceable because Defendants and their representatives had knowingly made material misrepresentations to the PTO in connection with the prosecution of that patent.

32. Nonetheless, Defendants commenced, prosecuted, and maintained the sham Infringement Actions against the Generic Manufacturers and defended against their counterclaim suits for the improper purpose of maintaining a monopoly in the Relevant Market, and to conceal that unlawful interference and monopoly maintenance.

33. Defendants continued to maintain the sham *Orange Book* listing, the Infringement Actions, and their sham defenses of the counterclaim suits knowingly, intentionally,

affirmatively, with the purpose of unlawfully maintaining their monopoly in the Relevant Market, and with the effect of affirmatively and continuously foreclosing the Generic Manufacturers and any other competitors from the Relevant Market.

34.  The FDA granted tentative approval to Eon's ANDA No. 75-280 on August 8, 1998, for nabumetone 500 mg and 750 mg tablets, and to Teva's ANDA No. 75-189 for nabumetone 500 mg and 750 mg tablets on December 24, 1998. This tentative approval reflected the FDA's determination that all the criteria for ANDA "Final" approval had been satisfied, except for the resolution of issues relating to patents or the 180-day exclusivity period. Final approval could not be granted until either the resolution of pending patent infringement litigation or the expiration of the 30-month stay.

35.  Final approval was granted on May 26, 2000 to Teva's ANDA No. 75-189 for nabumetone 500 mg tablets, and on June 6, 2000 to Copley's ANDA No. 75-179 for nabumetone 750 mg tablets.

**The Court's Ruling Invalidating The '639 Patent**

36.  On August 14, 2001, Judge Lindsay invalidated the '639 Patent due to prior art and anticipation. The Court also held that the '639 Patent was unenforceable because the Defendants made material misrepresentations to the PTO.

37.  The Court then found that the material misrepresentations made by Defendants were made with the intent of deceiving the PTO and entered judgment in favor of the Generic Manufacturers and against SmithKline and Beecham for patent invalidity and unenforceability.

38.  Defendants appealed that decision, which was affirmed on August 15, 2002, on the grounds that the patent was invalid because it had been anticipated by prior art. *SmithKline Beecham Corp. v. Copley Pharmaceutical, Inc.*, No. 01-1611, 2002 WL 1890708 (Fed. Cir. Aug.

15, 2002). The Court of Appeals did not reach the issue of inequitable conduct. *Id.* Defendants' post-appeal petitions were denied.

39. Teva began selling a 500 mg generic version of Relafen® on or about August 20, 2001. Teva began selling its 750 mg generic version on or about September 26, 2001.

40. Throughout the course of the proceedings before the PTO and for much of the litigation of the Infringement Actions, Defendants knowingly, willfully and fraudulently concealed the true facts about the Chatterjea & Prasad publication, their knowledge of the existence of prior art, and their misrepresentations to the PTO in order to wrongfully obtain the '639 Patent and to prevent and discourage lawful competition. Thus, Plaintiff States were prevented from discovering the Defendants' illegal conduct.

## V. RELEVANT MARKET

41. The relevant product market is the manufacture and sale of nabumetone-based prescription drugs. The relevant geographic market is the United States, including its commonwealths, territories, and protectorates as a whole.

42. The only seller of prescription drugs containing nabumetone in the United States could impose a significant, non-transitory price increase without losing sales sufficient to render the price increase unprofitable, as demonstrated by the Defendants' ability to charge supracompetitive prices for nabumetone during the period in which Relafen® lacked generic competition.

43. A material change in the price of nabumetone relative to that of other NSAIDs would not induce patients to switch. Other NSAIDs are not reasonably considered viable substitutes for Relafen® and generic nabumetone. Each NSAID may cause a variety of side effects, the most common of which are gastrointestinal side effects. Relafen® and generic

nabumetone may produce gastrointestinal and other side effects, but in a manner and extent which are different from, and less severe than, the gastrointestinal side effects of other NSAIDs.

44. Until approximately August 20, 2001, Defendants were the manufacturers and sellers of prescription drugs containing nabumetone in the United States. Their share of the Relevant Market was 100%.

## VI. TRADE AND COMMERCE

45. Throughout the relevant period, Relafen® was sold throughout the United States. Relafen® and nabumetone were transported across state lines and sold in each of the Plaintiff States.

46. Defendants' activities, including manufacturing, marketing, distributing and selling Relafen® and nabumetone were in the regular, continuous, and substantial flow of interstate commerce, and have had, and continue to have, a substantial effect upon interstate commerce.

## VII. MARKET EFFECTS

47. Defendants' illegal conduct had the purpose or effect of, or the tendency or capacity to, unreasonably restrain and injure competition by preventing the entry of generic nabumetone.

48. Absent Defendants' anticompetitive conduct, at least one generic competitor would have begun marketing a generic version of nabumetone well before August 2001.

49. If a generic competitor had been able to enter the Relevant Market and compete with Defendants, consumers and State Governmental Entities (as payors, purchasers, and reimbursers) would have been free to substitute -- and would have substituted -- a lower-priced generic for the higher-priced brand-name drug.

50. By preventing generic competitors from entering the market, Defendants deprived Plaintiff States and their consumers of the benefits of the competition that the federal and state antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws are designed to promote, preserve, and protect.

## VIII. INJURY

51. But for Defendants' anticompetitive acts, consumers and State Governmental Entities would have been able to purchase a generic nabumetone product at a far lower price than the monopoly prices maintained by Defendants, and beginning at an earlier time.

52. As a direct and proximate result of the unlawful conduct alleged above, Plaintiff States, including their State Governmental Entities, were not able to purchase, or pay reimbursements for purchases of, nabumetone products at prices determined by free and open competition, and consequently have been injured in their business and property in that, *inter alia*, they have paid more and continue to pay more for nabumetone products than they would have paid in a free and open competitive market.

53. As a direct and proximate result of the unlawful conduct alleged above, consumers were not able to purchase nabumetone products at prices determined by free and open competition, and consequently have been injured in their business or property in that, *inter alia*, they have paid more and continue to pay more for nabumetone products than they would have paid in a free and open competitive market.

54. As a direct and proximate result of the unlawful conduct alleged above, the general economies of the States have sustained injury, and are threatened with further injury to their business and property unless Defendants are enjoined from their unlawful conduct.

55. As a direct and proximate result of the unlawful conduct alleged above, Defendants have unjustly profited through inflated profit margins and have thus far retained the illegally obtained profits.

## X. ALLEGATIONS UNDER FEDERAL LAW

### COUNT I
### (Violations of Section 2 of the Sherman Act)

56. Plaintiff States repeat each and every preceding allegation as if fully set forth herein.

57. At all relevant times, Defendants maintained monopoly power in the Relevant Market.

58. As described above, Defendants knowingly and willfully engaged in conduct designed to unlawfully obtain and extend their monopoly power in the Relevant Market. These actions included, among others, (i) intentionally submitting false patent information to the FDA; (ii) intentionally submitting fraudulent statements to, and omitting material facts from, the PTO; (iii) prosecuting baseless, sham patent litigation against the Generic Manufacturers; and (iv) maintaining sham defenses to the counterclaims by the Generic Manufacturers.

59. Defendants' Infringement Actions were objectively baseless due to, *inter alia*, the presence of the Chatterjea & Prasad publication, and therefore constituted sham litigation. Further, the purpose of Defendants' notification in bringing the actions was to directly interfere with the ability of the Generic Manufacturers to market less expensive generic versions of Relafen® to compete with the brand-name product.

60. Defendants' illegally created and maintained monopoly power in the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

61. Defendants' conduct in unlawfully obtaining and maintaining a monopoly in the market for Relafen® and nabumetone injured the Plaintiff States in their business or property. Plaintiff States, including their consumers and State Governmental Entities, were deprived of the ability to purchase less expensive, generic versions of Relafen® and paid higher prices for nabumetone-based products than they would have paid, absent Defendants' unlawful conduct.

62. Defendants' anticompetitive and unlawful conduct alleged herein has injured competition in the Relevant Market by obtaining and maintaining their power to exclude competitors, reduce output, charge monopoly prices, reap monopoly profits and otherwise thwart competition in the Relevant Market.

## COUNT II
## (Unjust Enrichment)

63. Plaintiff States repeat each and every preceding allegation as if fully set forth herein.

64. As a result of their unlawful conduct described above, Defendants have been and will continue to be unjustly enriched. Defendants' unlawful acts include improperly listing their patent in the *Orange Book*; submitting fraudulent misrepresentations to, and concealing material facts from the PTO; filing and pursuing baseless patent infringement actions; and maintaining baseless defenses to counterclaims at the expense of the Plaintiff States.

65. Defendants' financial benefits from this unlawful and inequitable conduct, including obtaining unlawful overcharges and monopoly profits, were secured to the detriment of and expense of consumers. These benefits are traceable to overpayments for Relafen® by consumers.

66. The overcharges and unlawful monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Relafen® are the direct and proximate result of Defendants' unlawful practices.

67. The financial benefits derived by Defendants rightfully belong in substantial part to the Plaintiff States and consumers.

68. It would be inequitable and unjust for Defendants to be permitted to retain any of the unlawful proceeds resulting from their fraudulent, illegal, and inequitable conduct.

69. Defendants should be compelled to disgorge all unlawful or inequitable proceeds received by them. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff States and consumers.

## XI.   SUPPLEMENTAL STATE LAW CLAIMS

70. Defendants' conduct described herein constitutes unlawful acts of monopolization and attempts to monopolize, as well as prohibited practices and unconscionable conduct under the antitrust and/or unfair and deceptive trade practices acts of the Plaintiff States, as set forth below.

71. As a result of the conduct described above, Plaintiff States have sustained and will continue to sustain substantial losses and damage to their businesses and property because they were unable to purchase less expensive, generic versions of Relafen, and paid illegally inflated prices for nabumetone products.

72. Plaintiff States seek damages, multiple damages, treble damages, and other damages as permitted by state law, for their injuries caused by these violations pursuant to federal and state law as set forth below. Plaintiff States also seek a declaratory judgment that Defendants' conduct in seeking to prevent competition through the use of the invalid '639 Patent

is unlawful. Plaintiff States further seek equitable and injunctive relief to correct for the anti-competitive market effects and other harms to purchasers caused by the unlawful conduct of Defendants, and other relief so as to assure that similar conduct does not occur in the future.

73. Attorneys General in the Plaintiff States possess sufficient authority to settle and release consumer claims in a parens patriae or other representative capacity. Such authority falls into one of the following four categories: (i) parens patriae authority expressly conferred by the State legislature, (ii) authority expressly conferred by the State legislature that is the functional equivalent of parens patriae authority, (iii) judicially recognized authority to represent consumers, or (iv) authority to proceed as a class representative of consumers pursuant to Fed. R. Civ. P. 23. *F.T.C. v. Mylan Lab.*, 205 F.R.D. 369, 386 - 387 (D.D.C. 2002). In Mylan, the Court explicitly recognized these categories of authority.

74. Plaintiff State of Arkansas repeats and realleges each and every allegation contained in paragraphs 1 through 73.

75. Defendants' acts violate, and Plaintiff State of Arkansas is entitled to relief under, the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.* and the Arkansas Unfair Practices Act, Ark. Code Ann. §§ 4-75-201, et. seq, 4-75-301, et. seq.

76. Plaintiff State of Idaho repeats and realleges each and every allegation contained in paragraphs 1 through 73.

77. Defendants' acts violate, and Plaintiff State of Idaho is entitled to relief under the Idaho Competition Act, Idaho Code §§ 48-101 *et seq.*, and the Idaho Consumer Protection Act, Idaho Code §§ 48-601 *et seq.*

78. Plaintiff State of Illinois repeats and realleges each and every allegation contained in paragraphs 1 through 73.

79. Defendants' acts violate, and Plaintiff State of Illinois is entitled to relief under the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, including without limitation 740 ILCS 10/3(3).

80. Plaintiff State of Maryland repeats and realleges each and every allegation contained in paragraphs 1 through 73.

81. Defendants' acts violate, and Plaintiff State of Maryland is entitled to relief under the Maryland Antitrust Act, Md. Com. Law Code Ann. § 11-201, *et seq.* (2000).

82. Plaintiff State of Oregon repeats and realleges each and every allegation contained in paragraphs 1 through 73.

83. Defendants' acts violate, and Plaintiff State of Oregon is entitled to relief under the Oregon Antitrust Act, ORS 646.705, *et seq.*

84. Plaintiff State of Washington repeats and realleges each and every allegation contained in paragraphs 1 through 73.

85. Defendants' acts violate, and Plaintiff State of Washington is entitled to relief under, Wash. Rev. Code 19.86 RCW.

## RELIEF REQUESTED

Accordingly, the Plaintiff States demand judgment as follows:

86. Adjudging and decreeing that Defendants engaged in conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

87. Adjudging and decreeing that Defendants engaged in conduct in violation of the state statutes and state laws set forth in this Complaint;

88. Enjoining and restraining, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors and transferees, and the officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert